UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ROLLIN SMALL, )<br>)<br>    *Plaintiff* )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>*Acting Commissioner of Social Security,*[1] )<br>)<br>    *Defendant* ) | No. 1:12-cv-236-GZS |

### REPORT AND RECOMMENDED DECISION[2]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI") appeal raises the question of whether the administrative law judge supportably found the plaintiff capable of performing work existing in significant numbers in the national economy. The plaintiff seeks reversal and remand on the bases that the administrative law judge (i) failed to address and resolve serious inconsistencies between the testimony of a vocational expert and information contained in the Dictionary of Occupational Titles (U.S. Dep't of Labor, 4th ed. Rev. 1991) ("DOT"), in contravention of Social Security Ruling 00-4p ("SSR 004p"), and (ii) adopted the vocational expert's unreliable estimates of numbers of jobs available. *See* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (ECF No. 11) at 5-14. The commissioner does not contest that the administrative law judge's reliance on one of the three jobs at issue, that of flagger, was misplaced. However, I find no reversible error in the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is substituted as the defendant in this matter.
[2] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted his administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which he seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on March 12, 2013, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

administrative law judge's reliance on the remaining jobs, those of cleaner and escort vehicle driver.  Accordingly, I recommend that the court affirm the decision.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. §§ 404.1520, 416.920; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff met the insured status requirements of the Social Security Act through December 31, 1998, Finding 1, Record at 16; that he did not have a medically determinable physical or mental impairment on or before the date his insured status expired on December 31, 1998, Finding 3, *id*.; that, as of the date of his May 25, 2006, application for benefits, he had severe impairments of osteoarthritis of the cervical spine, bilateral carpal tunnel syndrome, and an affective disorder, Finding 4, *id*.; that he retained the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), and to perform frequent gross and fine manipulation but needed to avoid vibrations, had no limitations interacting with co-workers and supervisors but was incapable of interacting with the public, and was limited to simple, repetitive work, Finding 6, *id*. at 19; that, considering his age (34 years old, defined as a younger individual, on his alleged disability onset date), education (a general equivalency diploma), work experience (no transferable job skills), and RFC, there were jobs existing in significant numbers in the national economy that he could perform, Findings 8-11, *id*. at 26; and that he, therefore, was not disabled at any time prior to September 19, 2008, Finding 12, *id*. at 28, the date of a subsequent successful application for SSI benefits, *id*. at 13.[3]  The Appeals Council declined to review the

---

[3] Although, for purposes of the plaintiff's application for SSD benefits, he was required to demonstrate that he was disabled on or before his date last insured, December 31, 1998, SSI benefits are not tied to a claimant's date last insured.  *See Splude v. Apfel*, 165 F.3d 85, 87 (1st Cir. 1999) ("In 1972, Congress added a new social security program to provide 'supplemental security income' (called 'SSI') for 'aged, blind and disabled' persons of limited means regardless of their insured status.  This is a social welfare program funded out of general taxpayer revenues.
(*continued on next page*)

2

decision, *id*. at 6-8, making the decision the final determination of the commissioner, 20 C.F.R. §§ 404.981, 416.1481; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).[4]

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than his past relevant work. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

---

SSI is available even to those who qualify for SSD, but SSD income is considered in determining whether a disabled person qualifies for SSI under the latter's means test.") (citations omitted); *Chute v. Apfel*, No. 98-417-P-C, 1999 WL 33117135, at *1 n.2 (D. Me. Nov. 22, 1999) ("To be eligible to receive SSD benefits the plaintiff had to have been disabled on or before her date last insured (March 31, 1995); however, eligibility for SSI benefits is not dependent on insured status."). SSI benefits are payable for the period commencing the month after the filing of an SSI application, to the extent that a claimant can show that he or she was then disabled. *See, e.g.,* 20 C.F.R. § 416.335; *Baldwin v. Barnhart,* 167 Fed. Appx. 49, 51 (10th Cir. 2006); *Perkins v. Chater,* 107 F.3d 1290, 1295 (7th Cir. 1997).

[4] The decision was issued on remand from the Appeals Council, which vacated an earlier unfavorable decision on the plaintiff's May 26, 2006, applications for SSD and SSI benefits. *See* Record at 13. The details of the remand order are not pertinent here.

## I. Discussion

The scope of the plaintiff's appeal is narrow. He does not challenge the finding that, for purposes of SSD benefits, he failed to demonstrate that he had a medically determinable impairment on or before his date last insured of December 31, 1998. *See generally* Statement of Errors. He takes issue only with the finding that, for purposes of SSI benefits, he was able to perform work existing in significant numbers in the national economy for the period from May 25, 2006, the date of the application at issue, through September 18, 2008, the day prior to the date of a subsequent successful SSI application. *See generally id.*

### A. Background

On November 4, 2009, the administrative law judge presided over a post-remand hearing during which the vocational expert testified briefly concerning the plaintiff's past relevant work. *See* Record at 731, 795-98. By letter dated June 28, 2010, the administrative law judge sent the vocational expert interrogatories bearing, in relevant part, on the ability of a hypothetical claimant with an RFC identical to that ultimately found in this case to perform the jobs of flagger, DOT § 372.667-022, cleaner, DOT § 323.687-014, and escort vehicle driver, DOT § 919.663-022. *See id.* at 187-91.

On or about July 6, 2010, the vocational expert responded to the interrogatories, indicating that a person with the posited RFC could perform those three jobs. *See id*. at 190. He stated that there were 268 flagger jobs regionally and 42,877 nationally, about 2,000 cleaner jobs regionally and 370,000 nationally, and about 600 escort vehicle driver jobs regionally and 141,000 nationally. *See id*. The final interrogatory, Interrogatory No. 11, asked that the vocational expert check a box marked "Yes" and provide an explanation if there were any

conflicts between the occupational evidence that he had provided and the occupational information contained in, *inter alia*, the DOT. *See id*. at 191. He did not check the box. *See id.*

By letter dated July 30, 2010, to the administrative law judge, the plaintiff's counsel commented on the vocational expert's interrogatory answers, stating, "If after considering those comments you do not feel that you can render a fully favorable decision, I specifically request a supplemental hearing at which I may cross-examine [the vocational expert] as to each of the issues set out below, including the source and basis for his numbers." *Id*. at 193.

The plaintiff's counsel's comments included the following:

> 1. I do not believe that the RFC used in the interrogatories is correct and I object to it (I was not given an opportunity to review the interrogatories prior to [their] having been sent to [the vocational expert] and want to make clear that I am not waiving this objection).
>
> ***
>
> 3. [The vocational expert] asserts that there are certain numbers of jobs in the unspecified region and in the nation for the job of escort vehicle driver which he asserts the hypothetical individual could perform. Please note that the job is contained in census code 913. That census code contains a number of other jobs. I respectfully submit that there is no valid way for [the vocational expert] to tease out the number of jobs for this particular job from the larger group for which the statistics are kept by the Department of Labor, Bureau of Labor Statistics. Further, this job is not simple work. Thus I object to the validity of his suggestion of this job.
>
> 4. The same problem described in number 3, above, is present for the cleaner job. Cleaner is one of several jobs in census code 423. Again, there is no valid way to tease out the number of jobs for this particular job from the larger group for which the statistics are kept by the BLS. Additionally, despite his comment to the contrary in number 11, there is clearly a conflict with the DOT. Your RFC specifies no interacting with the public. The job description (copy submitted herewith) specifies that this job may include direct services to the public. Thus I also object to the validity of [the vocational expert's] suggestion of this job.
>
> 5. Finally, the problem described in number 3, above, is also present for the flagger job which is one of multiple jobs in census code 394. There is no valid way to tease out the number of jobs for this particular job from the larger

>  group for which the statistics are kept by the BLS.  Additionally, the flagger job
>  also requires interaction with the public. . . .  [T]he flagger job may also require
>  an ability to stand beyond the normal 6 hours expected for light work on at least
>  an intermittent basis during busy periods.  As noted above, there is no evidence
>  that [the plaintiff] can stand for extended periods. . . .

*Id*. at 193-94.

The administrative law judge convened a supplemental hearing on November 22, 2010, during which the plaintiff's counsel was permitted to examine the vocational expert concerning his interrogatory answers.  *See id*. at 799-820.

### B.  Asserted Failure To Resolve Inconsistencies Pursuant to SSR 00-4p

The plaintiff first argues that the administrative law judge failed to resolve inconsistencies between the vocational expert's testimony and the DOT's descriptions of the flagger, cleaner, and escort vehicle driver jobs, as required by SSR 00-4p.  *See* Statement of Errors at 6-9.  That ruling provides, in relevant part:

> The Responsibility To Ask About Conflicts
>
> When a VE [vocational expert] or VS [vocational specialist] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT.  In these situations, the adjudicator will:
>
> • Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> • If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> Explaining the Resolution
>
> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled.  The adjudicator will explain in the determination or decision how he or she resolved the conflict.  The

> adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2013), at 246.

At oral argument, counsel for the commissioner did not contest that the administrative law judge improperly relied on the job of flagger. However, she persuasively argued that there was no apparent conflict between the vocational expert's testimony and the DOT descriptions of the remaining two jobs.

The plaintiff contends that there is such a conflict with respect to the job of cleaner because the DOT describes the job as possibly including direct services to the public, which would be precluded by a restriction against working with the public. *See* Statement of Errors at 8; Record at 194; *see also* DOT § 323.687-014 (describing cleaner job as entailing, *inter alia*, "render[ing] personal assistance to patrons"). Yet, as counsel for the commissioner pointed out at oral argument, this court has recently rejected a nearly identical argument. *See Saucier v. Astrue*, No. 1:11-cv-411-NT, 2012 WL 5413372, at *6 (D. Me. Sept. 28, 2012) (rec. dec., *aff'd* Nov. 6, 2012) ("[A]t least one other court has found that the DOT description of the housekeeping cleaner job [DOT § 323.687-014, *see id*. at *4] does not involve a need for direct public contact. This authority supports the vocational expert's testimony and suggests that it is not necessarily inconsistent with the DOT. Any error in this regard was harmless.") (citation omitted). The plaintiff's counsel, during rebuttal argument, offered no reason why *Saucier* is not controlling, and I find it to be so.

Nor is there an SSR 00-4p error with respect to the job of escort vehicle driver. The plaintiff identifies no conflict between the vocational expert's description of the job and that of the DOT. *See* Statement of Errors at 8-9. Rather, he complains that the administrative law judge

7

failed to include a driving restriction in his hypothetical question to the vocational expert. *See id*. This plaint is without merit. The plaintiff relies almost entirely on lay testimony (his own and that of his wife, including his self-reports to an agency psychological examiner, Adrienne J. Butler, Ed.D.) to support the proposition that he was precluded or severely limited from driving. *See id*. at 8 (citing Record at 144, 152, 178, 211, 492, 683, 739, 767). Yet, the administrative law judge concluded for a number of reasons that the plaintiff's claimed symptoms were not credible to the extent inconsistent with the adopted RFC. *See* Record at 19-24.

The plaintiff argues that this credibility finding does not salvage the determination that he could work as an escort vehicle driver because (i) the administrative law judge failed to address the effects of driving on his impairment-related symptoms, as required by Social Security Ruling 96-7p ("SSR 96-7p"), and (ii) his claimed driving restrictions were corroborated by his wife and by an opinion of a treating physician, David C. Rioux, D.O., that he needed to periodically alternate sitting and standing to relieve pain or discomfort. *See* Statement of Errors at 8-9. I find no error. The administrative law judge acknowledged the claimed driving restrictions, *see* Record at 19, 22, but noted, *inter alia*, that the plaintiff had reported that he drove an automobile, *see id*. at 23. He also acknowledged the opinion of Dr. Rioux but rejected it for several reasons, including that it did not pertain to the period at issue. *See id*. at 24-25.

In sum, the administrative law judge did not fail to resolve any apparent conflict between the vocational expert's testimony and the DOT descriptions of the jobs of cleaner and escort vehicle driver.

### C.  Asserted Unreliability of Testimony on Numbers of Jobs

The plaintiff finally argues that the administrative law judge's reliance on all three jobs was misplaced in that the vocational expert's own testimony established that his job numbers

were unreliable. *See* Statement of Errors at 9-13. The plaintiff points out that the vocational expert testified that:

1. He obtained job number estimates from the Occupational Employment Quarterly ("OEQ"), published by U.S. Publishing. *See id*. at 10.

2. While he would expect the OEQ to use a "sophisticated, accurate" method to extract numbers for DOT-specific jobs from aggregate census code groupings of jobs at various exertional and skill levels, he did not know what method the OEQ used. *See id.* (quoting Record at 808-09).

3. If the OEQ merely divided the total number of DOT-specific jobs in the census code grouping into the aggregate number of jobs for the census code as a whole, he did not think that "it would be a valid method to do that." *Id*. at 10-11 (quoting Record at 808).

The plaintiff points out that, post-hearing, per an offer of proof made during the hearing, his counsel transmitted to the administrative law judge copies of a February 2002 exchange of letters between Attorney Robert C. Angermeier and Don Vander Vegt, the publisher of U.S. Publishing, verifying that the methodology that the vocational expert testified would be invalid is the one that is actually employed. *See* Statement of Errors at 11 & n.1; Record at 819-20; *see also* Exhibit A (ECF No. 14-1) to Motion To Supplement the Record (ECF No. 14).[5] In his cover letter transmitting the materials, the plaintiff's counsel stated:

> [T]he methodology they use is simply to assign the jobs in proportion to the number of DOT titles. [The vocational expert] specifically agreed on cross examination that that is not a valid method and thus would not support his use of their numbers.

---

[5] The Motion To Supplement the Record was granted without objection during a February 19, 2013, teleconference with counsel. *See* ECF No. 17.

ECF No. 14-1 at [2].[6]

> The administrative law judge rejected this challenge, stating:
>
> Although the [plaintiff's] representative argued in a post-hearing brief and at the supplemental hearing held on November 22, 2010, that these numbers are unreliable, and that there is no valid way to tease out the number of jobs for particular job[s] from larger groups for which statistics are kept by Department of Labor, Bureau of Labor Statistics, this argument is not adopted. The vocational expert testified at the supplemental hearing held on November 22, 2010, that he derived his numbers from the publication Occupational Employment Quarterly II from the Department of Labor, Bureau of Labor Statistics. While he admitted that he did not know the methodology of how the Occupational Employment Quarterly got their numbers, and that the numbers could change with the economy, they seem to be reliable and consistent with the Department of Labor statistics. The vocational expert also indicated on the July 6, 2010, interrogatory that he believed that the source of the numbers as well as the numbers themselves were reliable, and testified on November 22, 2010, that based on his education, training, and experience, the numbers given by this publication appear to be correct. As set out in the regulations, publications from the Department of Labor constitute recognized standard sources of reliable job information (20 C.F.R. 404.1566(d)). It is therefore concluded that the numbers cited from these publications by the impartial vocational expert are an accurate representation of the number of jobs existing in the regional and national economies which the [plaintiff] can perform.

Record at 27 (citations omitted).

The plaintiff argues on appeal that the administrative law judge (i) wrongly characterized the OEQ II, a private publication based on BLS statistics, as a BLS publication and accordingly a recognized source of reliable job information, an error that in itself requires remand, and

---

[6] Angermeier asked Vander Vegt to confirm his understanding that U.S. Publishing determined numbers of jobs within a census code at certain exertional and skill levels as illustrated by the following example with respect to skill levels: "if there was a hypothetical census code which contained equal numbers of unskilled, semi-skilled, and skilled occupations collected under a single census code, your estimates would reflect equal numbers of jobs distributed between unskilled, semi-skilled, and unskilled occupations." ECF No. 14-1 at [4]. Vander Vegt wrote to Angermeier: "You are correct in your understanding of how the number of DOT titles determine the distribution of jobs by skill and exertion level, however we also advise professionals who use this data to incorporate their own knowledge of a specific labor market. . . . While all of our data is from government sources it should be remembered that all data from the government are estimates. Even census data which is based on an actual count ends up being an estimate due to missed individuals and errors." *Id*. at [5].

(ii) found, in the absence of substantial evidence, that the job numbers were reliable.[7] The plaintiff is correct that the OEQ II is a private publication. The OEQ II's estimates of numbers of DOT-specific jobs, while based on aggregate BLS data, are not BLS estimates, but rather estimates by the private publisher, U.S. Publishing. Thus, the administrative law judge erred in taking administrative notice of OEQ II data as "reliable job information" pursuant to 20 C.F.R. § 404.1566(d). Nonetheless, the error is harmless. This was not the sole basis for his acceptance of the vocational expert's job number estimates; rather, he also credited that expert's testimony that, based on his education, training, and experience, he considered those estimates reasonably accurate.

The plaintiff cites three cases for the proposition that the vocational expert's job numbers testimony was too unreliable to carry the commissioner's burden at Step 5: *St. Pierre v. Astrue*. No. 1:10-cv-104-JAW, 2010 WL 5465635 (D. Me. Dec. 29, 2010) (rec. dec., *aff'd* Jan. 19, 2011); *Clark v. Astrue* ("*Clark I*"), Civil No. 09-390-P-H (D. Me. July 19, 2010) (rec. dec., *aff'd* Aug. 9, 2010); and *McDonald v. Barnhart*, No. 05-69-B-W, 2005 WL 3263937 (D. Me. Nov. 30, 2005) (rec. dec., *aff'd* Dec. 20, 2005). *See* Statement of Errors at 10, 12-13. I am unpersuaded.

On two previous occasions, this court has considered arguments by the same counsel that the OEQ methodology is unreliable. *See Clark v. Astrue* ("*Clark II*"), No. 2:11-cv-373-DBH, 2012 WL 2913700, at *3-*4 (D. Me. June 28, 2012) (rec. dec., *aff'd* July 17, 2012); *Woodard v. Astrue*, No. 1:10-cv-327-DBH, 2011 WL 2580641, at *5 (D. Me. June 28, 2011) (rec. dec., *aff'd* July 19, 2011). In *Woodard*, the claimant's counsel established on cross-examination of a vocational expert that the OEQ derived its numbers from census data containing a mix of

---

[7] At oral argument, the plaintiff's counsel offered, as a demonstrative aide only, two pages from OEQ II. Counsel for the commissioner did not object to the consideration of those materials for that purpose, and I have taken them into consideration.

exertional and skill levels. *See Woodard*, 2011 WL 2580641, at *5. The administrative law judge then asked the vocational expert, "Based on your professional experience do those numbers sound realistic in terms of availability?" *Id.* (citation and internal quotation marks omitted). The vocational expert responded that they did. *See id.* The court held that her testimony passed muster because she had relied not only on the OEQ numbers but also on her professional expertise. *See id.* This distinguished the testimony in *Woodard* from that at issue in *Clark I* and *St. Pierre*, in which the vocational experts had essentially admitted that they had relied on published raw numbers pertaining not to DOT-specific jobs but to groups of jobs of differing skill and exertional levels that happened to contain the DOT-specific jobs at issue. *See id*.

In *Clark II*, as in this case, counsel submitted the exchange of letters between Angermeier and Vander Vegt to an administrative law judge in support of the argument that the OEQ methodology was unreliable. *See Clark II*, 2012 WL 2913700, at *3. The administrative law judge addressed but rejected the argument, noting, *inter alia*, that (i) the claimant's reliance on fleeting private communication concerning complex statistical methodology was dubious, (ii) in any event, the vocational expert had brought his own expertise to bear, as Vander Vegt suggested professionals should do in using the OEQ numbers, and (iii) there was no regulatory requirement to determine job numbers with the degree of precision suggested by the claimant. *See id*. at *3-*4.

The court rejected the claimant's challenge to the use of the OEQ data, distinguishing *Clark I* and *St. Pierre* on the bases that the vocational expert in *Clark II* was able to offer numbers for DOT-specific jobs, not groups of jobs of differing skill and exertional levels, and had testified that the OEQ data was the best data available. *See id*. The court concluded: "To

hold otherwise, under the circumstances of this case, would compel a vocational expert to undertake personally a study of the labor market for every specific job he or she might testify is available for a particular claimant, an unnecessarily extensive and expensive requirement to impose upon the defendant." *Id*. (footnote omitted).[8] *See also, e.g., Farrin v. Barnhart*, No. 05-144-P-H, 2006 WL 549376, at *4 (D. Me. Mar. 6, 2006) (rec. dec., *aff'd* Mar. 28, 2006) ("A vocational expert's testimony must be based on estimates by its very nature. The social security scheme does not contemplate that vocational experts will have the benefit of actual market surveys for each case in which they may testify.").

Here, as in *Clark II*, the vocational expert gave job numbers for DOT-specific jobs, not aggregate groups of jobs of varying skill and exertional levels. *See, e.g.,* Record at 808. And here, as in *Woodard* and *Clark II*, the vocational expert testified that, based on his education, training, and experience, the numbers appeared reasonable. *See id*. at 812-13, 816-17.

The plaintiff underscores that, in this case, the vocational expert testified that he did not know what methodology the OEQ used and that a methodology of simply dividing an aggregate number of jobs by the total number of jobs in that group would not be valid. *See* Statement of Errors at 10-11; Record at 808. He adds that, although the vocational expert further testified that the numbers appeared reasonable, his explanation for that conclusion does not withstand scrutiny. *See* Statement of Errors at 12-13 ("Essentially, the [vocational expert] testified that he merely monitored the OEQ numbers over time and found them to be consistent on that basis. The obvious problem with such testimony is that the internal consistency of OEQ job number

---

[8] The court in *Clark II* found *McDonald*, cited by the claimant in that case as well, readily distinguishable in that the vocational expert in *Clark II* had not testified "that 'some adjustment' of the numbers would be necessary, that the actual number of jobs would be 'not quite as much' or 'significantly limited,' or in any other similarly 'murky' terms." *Clark II*, 2012 WL 2913700, at *4 n.3 (quoting *McDonald*, 2005 WL 3263937, at *4). The same is true here.

13

estimates is meaningless where, as here, the underlying methodology used to generate those estimates does not produce accurate and reliable DOT-specific job numbers. Thus, the [vocational expert's] comfort level with the 'consistency' of the OEQ estimates is simply not probative.") (citation omitted).

Nonetheless, I conclude that these differences from *Woodard* and *Clark II* are not dispositive. First and most critically, the use of the OEQ data allowed the vocational expert to offer numbers for DOT-specific jobs, curing the problem identified in *Clark I* and *St. Pierre*. Second, despite his testimony that the methodology at issue would be invalid, the vocational expert endorsed the particular numbers that he supplied in this case. In so doing, he did not rely solely on the consistency over time of the OEQ and Department of Labor ("DOL") numbers. With respect to the cleaner job, he also relied on his knowledge that "cleaner, housekeeping" is the predominant job among three listed within one code, *see* Record at 805, and with respect to jobs in Maine, he relied on his personal experience and observation, such as the number of escort vehicle job openings listed in the newspaper and the number of escort vehicles on the road, *see id*. at 815.[9]

Third, on this record, I find no reason to question this court's concern in *Clark II* that to hold the OEQ data invalid would compel vocational experts to undertake time-consuming personal studies of the labor market – a concern reiterated with some force by counsel for the commissioner at oral argument. The plaintiff's counsel contended that vocational experts have available and increasingly are using other, more accurate tools than the OEQ to estimate

---

[9] At oral argument, the plaintiff's counsel contended that the vocational expert had unintentionally highlighted the vice of the OEQ II methodology when he testified that the number of cleaner jobs was larger proportionally than the number of other jobs grouped within its overarching occupational code. Even granting that the OEQ II number underrepresents the actual number of cleaner jobs, that strengthens, rather than calling into question, the determination that the cleaner job exists in significant numbers in the national economy.

numbers of DOT-specific jobs, such as the Job Browser Pro program. But that is the argument of counsel, not record evidence. And in this very case, the vocational expert testified that, to supply numbers of DOT-specific jobs without relying on the OEQ, he would have had to undertake the DOL research himself, a time-consuming task that he had reluctantly undertaken from time to time in the past. *See* Record at 811-12.

For these reasons, the finding that the vocational expert gave reliable testimony concerning numbers of jobs is supported by substantial evidence. That suffices to meet the commissioner's Step 5 burden.

Should the court agree with the foregoing conclusions, two jobs survive scrutiny, those of cleaner and escort vehicle driver. "As this court has repeatedly held, the availability of a single job that meets the criteria of the RFC established by the administrative law judge is sufficient." *Saucier*, 2012 WL 5413372, at *6.

## II. Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **AFFIRMED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 30th day of March, 2013.

                                                      /s/ John H. Rich III
                                                      John H. Rich III
                                                      United States Magistrate Judge